NEAL S. ZASLAVSKY (SBN 277543)
  neal@nszlegal.com
NADAV Y. ZOHAR (SBN 311538)
  nadav@nszlegal.com
**LAW OFFICE OF NEAL S. ZASLAVSKY,**
**A PROFESSIONAL CORPORATION**
8335 Sunset Boulevard, Suite 202
West Hollywood, California 90069
Telephone: (323) 389-1881
Facsimile: (323) 389-1885

Attorneys for Plaintiff
*Irene Zendano*

## UNITED STATES DISTRICT COURT

## IN AND FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IRENE ZENDANO**, individually and as Trustee of The Irene Valerie Zendano Family Revocable Living Trust U.T.D. May 9, 2015,<br><br>Plaintiff,<br><br>v.<br><br>**BASTA, INC.**, a California nonprofit corporation; **THE LAW OFFICE OF DANIEL J. BRAMZON & ASSOCIATES, P.C.**, a California corporation; **ALATORRE & ASSOCIATES PROFESSIONAL LAW CORPORATION**, a California corporation; **ANDRES X. ALATORRE**, an individual; **KEVIN P. HERMANSEN**, an individual; **DANIEL J. BRAMZON**, an individual; and **DOES 1-10**, inclusive,<br><br>Defendants. | Case No.   **2:18-cv-05154**<br><br>**COMPLAINT FOR:**<br><br>**(1)  RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. § 1961 et seq. [CIVIL RICO];**<br><br>**(2)  ECONOMIC DURESS AND CIVIL EXTORTION;**<br><br>**(3)  FRAUD;**<br><br>**(4)  CONVERSION; and**<br><br>**(5)  VIOLATION OF BUS. & PROF. CODE § 17200 et. seq., UNLAWFUL, FRAUDULENT AND UNFAIR BUSINESS ACTS AND PRACTICES.** |

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse in citizenship and the amount in controversy is greater than seventy-five thousand dollars ($75,000).

2.     This Court has subject matter jurisdiction over this case based on federal question jurisdiction, as the Plaintiff has brought claims arising under 18 U.S.C. § 1961 et seq. [Civil RICO].

3.     This is a civil action arising under both federal law and California's statutory and common law.

4.     Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to this Complaint have largely happened in this district and the property at issue is located in this district.

5.     This Court has personal jurisdiction over each Defendant because each Defendant resides within and transacts a material amount of business within Los Angeles County.

**PARTIES**

**Plaintiff**

6.     Plaintiff **IRENE ZENDANO**, individually and as Trustee of The Irene Valerie Zendano Family Revocable Living Trust U.T.D. May 9, 2015 ("MS. ZENDANO"), is a natural person who resides in and is a citizen of Erie County, New York.  At the time that this Complaint is filed, MS. ZENDANO is a citizen of the State of New York.  MS. ZENDANO is the former owner of the real property located at 832 Sandy Hook Avenue in the City of La Puente, County of Los Angeles, State of California, Zip Code 91744, APN 8212-017-023 (the "Premises"), and at all times relevant herein, was the owner of the Premises.

COMPLAINT

**<u>Defendants</u>**

7. Defendant **BASTA, INC.,** a California nonprofit corporation ("BASTA") is incorporated in, domiciled in, and has its nerve center in the State of California and as such is a citizen of California.  BASTA is a citizen of California at the time that this Complaint is being filed.  BASTA is an enterprise actor and formed an association in fact enterprise with the other enterprise actors to extort monies from and demanding payment of an unlawful debt from MS. ZENDANO through a pattern of racketeering activity.

8. Defendant **THE LAW OFFICE OF DANIEL J. BRAMZON & ASSOCIATES, P.C.,** a California corporation ("BRAMZON FIRM") is incorporated in, domiciled in, and has its nerve center in the State of California and as such is a citizen of California.  The BRAMZON FIRM is a citizen of California at the time that this Complaint is being filed.  The BRAMZON FIRM is an enterprise actor and formed an association in fact enterprise with the other enterprise actors to extort monies from and demanding payment of an unlawful debt from MS. ZENDANO through a pattern of racketeering activity.

9. Defendant **ALATORRE & ASSOCIATES PROFESSIONAL LAW CORPORATION**, a California corporation ("ALATORRE FIRM") is incorporated in, domiciled in, and has its nerve center in the State of California and as such is a citizen of California.  The ALATORRE FIRM is a citizen of California at the time that this Complaint is being filed.  The ALATORRE FIRM is an enterprise actor and formed an association in fact enterprise with the other enterprise actors to extort monies from and demanding payment of an unlawful debt from MS. ZENDANO through a pattern of racketeering activity.

10. Defendant **ANDRES X. ALATORRE**, an individual ("ALATORRE"), is a natural person domiciled in, having his principal place of business in, and transacting business in Los Angeles County and as such is a citizen of California.  ALATORRE is a citizen of California at the time that this Complaint is being filed.

ALATORRE is also an attorney duly admitted to practice law in the State of California, with a California Bar Number of 277913.  ALATORRE is named as an individual defendant who conspired with other individual RICO defendants and enterprise actors named herein to form an association in fact enterprise with the other enterprise actors to extort monies from and demanding payment of an unlawful debt from MS. ZENDANO through a pattern of racketeering activity.

11.     Defendant **KEVIN P. HERMANSEN**, an individual ("HERMANSEN"), is a natural person domiciled in, having his principal place of business in, and transacting business in Los Angeles County and as such is a citizen of California.  HERMANSEN is a citizen of California at the time that this Complaint is being filed.  HERMANSEN is also an attorney duly admitted to practice law in the State of California, with a California Bar Number of 266254.  HERMANSEN is named as an individual defendant who conspired with other individual RICO defendants and enterprise actors named herein to form an association in fact enterprise with the other enterprise actors to extort monies from and demanding payment of an unlawful debt from MS. ZENDANO through a pattern of racketeering activity.

12.     Defendant **DANIEL J. BRAMZON**, an individual ("BRAMZON"), is a natural person domiciled in, having his principal place of business in, and transacting business in Los Angeles County and as such is a citizen of California.  BRAMZON is a citizen of California at the time that this Complaint is being filed.  BRAMZON is an also attorney duly admitted to practice law in the State of California, with a California Bar Number of 214324.  BRAMZON is named as an individual defendant who conspired with other individual RICO defendants and enterprise actors named herein to form an association in fact enterprise with the other enterprise actors to extort monies from and demanding payment of an unlawful debt from MS. ZENDANO through a pattern of racketeering activity.

13.     MS. ZENDANO is informed and believes, and based thereon alleges, that at all times relevant to this Complaint, Defendants, and each of them, were acting

-4-

COMPLAINT

as the agent, servant, employee, subsidiary, joint venturer, affiliate, partner, assignee, successor-in-interest, *alter ego*, or other representative of each other, and were acting within the course and scope of their agency, servitude, employment, subsidy, joint venture, affiliation, partnership, assignment, succession, *alter ego*, and/or representation, with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

14.     MS. ZENDANO is informed and believes, and based thereon alleges, that at all times relevant to this Complaint, Defendants, and each of them, participated as members of a conspiracy and/or aided and abetted one another in furtherance of the schemes alleged herein, or assisted one another in carrying out the purpose of the conspiracy alleged herein, and have performed acts and made statements in furtherance of the conspiracy, all in violation of both Federal and California law. Each of the Defendants acted both individually and in concert with the other Defendants with full knowledge of their respective wrongful conduct.  As such, the Defendants, and each of them, conspired together, building upon each other's wrongdoing, in order to accomplish the acts complained of herein.  Defendants are therefore sued as principals, participants, and/or aiders and abettors in the wrongful conduct complained of, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, schemes, plans, conspiracies or transactions complained of herein.

15.     Numerous individuals and separate entities, currently sued as Does 1-10, have actively participated during the course of and in furtherance of the wrongdoing alleged and complained of herein.  The individuals and entities acted pursuant to agreement and in concert with each of the other Defendants in this action, whether specifically identified by name or whether sued under a fictitious name.  Each has also acted as an agent for the principals, in order to advance the objectives of the conspiracy.

-5-

COMPLAINT

16.     MS. ZENDANO is presently ignorant of the true names and capacities of each of the Defendants sued as Does 1-10, inclusive, and therefore sues these Defendants by such fictitious names and capacities pursuant to C.D. Cal. Local Rule 19-1.  MS. ZENDANO is informed and believes, and on this basis alleges, that each fictitiously named Defendant is responsible in some manner for the alleged acts and failures to act, and that MS. ZENDANO's injuries were legally and proximately caused by the conduct of each such Defendant.  Pursuant to Fed. R. Civ. P. 15(a)(2), and Fed. R. Civ. P. 21, MS. ZENDANO will seek leave of the Court to amend this Complaint to allege the true identities of these fictitiously named Defendants, once their name(s) and capacity(ies) are ascertained.  MS. ZENDANO will also seek leave of the Court to amend this Complaint pursuant to Fed. R. Civ. P. 15(a)(2) to allege with further specificity the manner in which each fictitiously named Defendant is response for the damages sustained by MS. ZENDANO.

## BACKGROUND FACTS FROM RELATED PROCEEDINGS

17.     The Premises were owned by the late Irene Elizabeth Bland ("the late Mrs. Bland") for nearly half a century, from 1967 until her death in 2015.  On November 1, 2002, the late Mrs. Bland settled the Irene Elizabeth Bland Revocable Living Trust 2002 (the "Bland Trust") therein naming herself as the initial trustee, and naming MS. ZENDANO as the successor trustee.  The terms of the Bland Trust provided *inter alia* that upon her death, "[t]he trustee shall distribute the remaining trust property (including all income then accrued but uncollected and all income then remaining in the hands of the trustee) outright to the settlor's granddaughter, Irene Valerie Zendano."  The existence and the terms of the Bland Trust were well known within the family *ab initio*.

18.     The late Mrs. Bland deceased on February 24, 2015.

///
///

COMPLAINT

19.     On May 11, 2015, MS. ZENDANO, as Successor Trustee of the Bland Trust, transferred title to the Premises to herself as Trustee of the Irene Valerie Zendano Family Revocable Living Trust U.T.D. May 9, 2015 (the "Zendano Trust").

20.     In the early fall of 2015, MS. ZENDANO learned that her cousin Elizabeth Bland ("ELIZABETH"), ELIZABETH's husband Corrie Archer ("ARCHER") and their children were living in substandard and deplorable conditions and desperately needed a place to stay temporarily.  While MS. ZENDANO had originally planned to move her own family into the Premises, she was not quite ready to relocate from New York where she was residing, so on or about October 15, 2015, MS. ZENDANO agreed to rent the Premises for six (6) month fixed term to ELIZABETH and ARCHER, and further permitted her uncle Ronald Bland ("RONALD") to remain upon the Premises during this time.

21.      MS. ZENDANO agreed to rent the Premises – a four-bedroom, two-bath home – to her relatives for only nine hundred dollars ($900) a month including utilities, just enough to cover the taxes, utilities, and maintenance on the Premises while MS. ZENDANO made plans to relocate her family.

22.     Shortly after renting the Premises to ELIZABETH and ARCHER, MS. ZENDANO learned that ARCHER was a sex offender convicted of lewd and lascivious acts with a child under 14.  Apparently, because of ARCHER's status as a registered sex offender, it was difficult for him to find a place to live.

23.     On April 15, 2016, ELIZABETH and ARCHER's lease on the Premises expired.  Because she was still not ready to move her family into the Premises, MS. ZENDANO allowed the tenants to remain on a month-to-month basis while she finalized her plans to move her family into the Premises.

24.     In the summer of 2016, MS. ZENDANO notified her tenants that she was ready to move her family into the Premises, and ELIZABETH, ARCHER, and RONALD agreed to vacate the Premises on or before November 1, 2016. Troublingly, despite their promise to vacate, the tenants did not in fact vacate.

25.     Because the tenants failed to vacate the Premises, MS. ZENDANO was left with no other option but to serve them with a Sixty (60) day notice to quit on November 29, 2016.

26.     Just as they failed to vacate the Premises once before, the tenants also failed to vacate before the 60 day notice expired.  MS. ZENDANO commenced eviction proceedings by filing a Complaint for Unlawful Detainer on February 10, 2017 in the Los Angeles County Superior Court, Case No. 17UR0333 (the "First Eviction").  This case was originally scheduled for trial on March 17, 2017.  Troublingly, the tenants, aided and abeted by ALATORRE and the ALATORRE FIRM, conspired to delay the First Eviction as long as possible.

27.     On March 16, 2017, the eve of trial, RONALD filed a petition in the Probate Department of the Los Angeles County Superior Court, Case No. 17STPB02292 (the "Probate Action") seeking *inter alia* to void the transfer of the Premises to MS. ZENDANO.  RONALD also applied to the Probate Court *ex parte* on March 16, 2017, unsuccessfully seeking to stay the First Eviction.  RONALD also concurrently recorded a *lis pendens* with the Los Angeles County Recorder, clouding MS. ZENDANO's title to the Premises.

28.     When the Probate Court denied RONALD's *ex parte* application for a stay, ELIZABETH filed a sham Bankruptcy Petition (Case No. 2:17-bk-13236, United States Bankruptcy Court for the Central District of California) late in the day on March 16, 2017 to invoke the Bankruptcy Code's automatic stay provision.  ALATORRE did not advise MS. ZENDANO's counsel of the Bankruptcy filing until late in the morning on March 17, 2017 when the Court called the First Eviction for its scheduled trial.

29.     The First Eviction was stayed until May 17, 2017 when the Bankruptcy Court granted MS. ZENDANO's motion for relief from stay.  Later on that same day, the Bankruptcy Court actually dismissed ELIZABETH's petition, as she had twice

-8-

COMPLAINT

1   failed to appear for her mandatory 341(a) meeting of creditors in her sham Bankruptcy

2   proceeding.

3         30.    After more delays orchestrated by ALATORRE, the ALATORRE FIRM,

4   ELIZABETH, and ARCHER, the First Eviction was calendared for June 14, 2017.

5   The First Eviction was ultimately unsuccessful solely due to a questionable technical

6   defect in the underlying 60 day notice to quit.  Indeed, the 60 day notice did not advise

7   the tenants that "State law permits former tenants to reclaim abandoned personal

8   property left at the former address of the tenant, subject to certain conditions. You

9   may or may not be able to reclaim property without incurring additional costs,

10   depending on the cost of storing the property and the length of time before it is

11   reclaimed. In general, these costs will be lower the sooner you contact your former

12   landlord after being notified that property belonging to you was left behind after you

13   moved out."  The Courts have been split on whether the omission of this warning is

14   material enough to invalidate an eviction.

15         31.    Troublingly, the Defendants in the First Eviction (represented by

16   ALATORRE and the ALATORRE FIRM) failed to demur to the Complaint based on

17   this purported facial defect, and further failed plead this purported defect as an

18   affirmative defense to the UD Complaint itself.  Indeed, in a cynical attempt to drag

19   out the eviction process as long as possible and to churn fees, ALATORRE and the

20   ALATORRE FIRM failed to disclose this information in any pre-trial pleading, failed

21   to include this information in response to numerous relevant discovery requests, and

22   instead ***deliberately*** and ***unethically*** sprung it as a cunctative ambush tactic in the

23   middle of trial.  This sanctionable conduct by ALATORRE and the ALATORRE

24   FIRM ran afoul of the axiomatic holding in <u>Puerto v. Superior Court</u>, 158 Cal. App.

25   4th 1242, 1249, 70 Cal. Rptr. 3d 701, 706 (Cal. Ct. App. 2008) wherein the Court held

26   that the "expansive scope of discovery is a deliberate attempt to take the game element

27   out of trial preparation and to do away with the sporting theory of litigation—namely,

28   surprise at the trial."

COMPLAINT

32.     During the entire pendency of the First Eviction (and indeed since long before the First Eviction was actually filed), the tenants stopped paying rent on the Premises.  When the First Eviction was unsuccessful, MS. ZENDANO served the tenants with a 3-day notice to pay or quit.  The pay or quit notice was served on June 16, 2017, and when the tenants did not pay, MS. ZENDANO commenced another action for Unlawful Detainer in the Los Angeles County Superior Court, Case No. 17UR1510 on June 22, 2017 (the "Second Eviction.")

33.     Pursuant to a stipulated judgment, the tenants were to vacate the Property no later than August 8, 2017.  Troublingly, the tenants did not timely vacate the Premises, and on August 15, 2017, the Los Angeles County Sheriff forcibly removed the tenants from the Premises.

34.     The Probate Action continued, with RONALD engaging in numerous cunctative tactics, including *inter alia* failing to appear for his duly noticed deposition and failing to comply with numerous Court orders relating to discovery.

35.     On March 13, 2018, MS. ZENDANO filed a Motion for Terminating Sanctions in the Probate Action.  On April 24, 2018, at the hearing on the terminating sanctions motion, the Court indeed granted MS. ZENDANO's motion and simultaneously ordered the *lis pendens* to be expunged.  The Probate Court signed the final order on May 3, 2018, and the expungement of the *lis pendens* was recorded with the Los Angeles County Recorder on May 9, 2018.

## ALATORRE AND THE ALATORRE FIRM FILE A WILDLY INFLATED MOTION FOR ATTORNEY'S FEES RELATED TO THE FIRST EVICTION

36.     Before the ink was dry on the stipulated judgment in the Second Eviction, ALATORRE and the ALATORRE FIRM filed a wildly inflated motion for attorney's fees related to the First Eviction (the "Fee Motion"), as the underlying lease therein contained a very broad attorney's fees clause.

-10-

37.     In their Fee Motion, ALATORRE and the ALATORRE FIRM requested a shocking and facially absurd twenty-five thousand, one hundred and thirty dollars ($25,130) in legal fees.  MS. ZENDANO opposed the Fee Motion, and the Court slashed the fees down to fifteen thousand, eight hundred and twenty dollars ($15,820) including court costs.

38.     Shortly after receiving the reduced fee and cost award, ALATORRE and the ALATORRE FIRM engaged the services of co-Defendants BASTA, the BRAMZON FIRM, HERMANSEN, and BRAMZON to aggressively attempt to collect these fees from MS. ZENDANO who by then was essentially homeless and living off of the good graces and kindness of her husband's family as the protracted legal battles had drained her of all of her assets (and then some).

39.     As part of their collection efforts, the Defendants further clouded MS. ZENDANO's title to the Premises by recording an involuntary lien for the $15,820 fee and cost award.

### THE DEFENDANTS ENGAGE IN A PATTERN OF
### ILLEGAL CONDUCT IN THEIR EFFORTS
### TO EXTORT EVEN MORE MONEY FROM MS. ZENDANO

40.     On or about February 7, 2018, co-Defendants BASTA, the BRAMZON FIRM, HERMANSEN, and BRAMZON filed a Memorandum of Costs After Judgment (the "First Cost Memo") in the amount of two thousand, two hundred and seventy dollars ($2,270.00).  As with the Defendants' over-inflated request in the Fee Motion which was dramatically slashed by the Court, the First Cost Memo was also bloated with absurd requests and billing entries.  By way of example, the First Cost Memo included:

a.      In HERMANSEN's declaration to the First Cost Memo, he claimed that he had spent 0.7 hours on September 27, 2017 reviewing an attorney's fees judgment and drafting a notice of association of counsel.  The

-11-

COMPLAINT

1  judgment is about 35 lines of very simple text and wouldn't require a

2  reasonable attorney – particularly one with 9 years of experience like Mr.

3  Hermansen – more than a couple of minutes to read.  And as for a Notice of

4  Association of Counsel, a firm like BASTA and the BRAMZON FIRM where

5  Mr. Hermansen works, they undoubtedly have a simple template for this, and a

6  legal secretary could have filled in the blanks and prepared such a form in just a

7  few minutes.  For what was likely 0.1 hours of attorney time and 0.1 hours of

8  clerical time, the Defendants attempted to extort $245 from Ms. Zendano.

9       b.    In his declaration, HERMANSEN also dubiously claimed that he

10  had spent 0.9 hours on an asset search on September 28, 2017.  This was, again,

11  a clerical or paraprofessional task, and since Lexis-Nexis bills Accurint as being

12  designed to "quickly and reliably locate people, companies and assets," it is

13  highly unlikely that even an inexperienced clerk would have spent more than a

14  few minutes performing such an asset search (particularly for a person like MS.

15  ZENDANO, who had extremely limited assets).  Hermansen repeated his folly

16  with Accurint when he claimed to have spent 0.7 hours on February 7, 2018

17  researching MS. ZENDANO's address.  All totaled, HERMANSEN claimed to

18  have incurred fees of $560 (at a rate of $350 per hour) for what was likely about

19  10 minutes of a clerk's time.

20       c.    In his declaration, HERMANSEN also claimed that he personally

21  prepared the Abstract of Judgment form on September 27, 2017, an

22  administrative task which is generally performed by a paralegal or secretary.

23  Not only did he inappropriately bill this as attorney time at $350 per hour, he

24  billed another 0.2 hours of attorney time to review the form once it came back

25  from the Clerk of the Court.  Indeed, while an attorney might have spent a

26  minute or two reviewing a secretary's work before having the completed form

27  sent to the court, there would be nothing to "check" on the form once it came

28  back from the Clerk.

-12-

d.      In his declaration, HERMANSEN also shockingly claimed to have spent 0.2 hours giving "instructions" to a process server about how to record a document with the County Recorder.  Since this is a routine task that process servers perform on a daily basis, it is unlikely that 12 minutes of explanation would ever be necessary.  And it was highly unlikely that an attorney was involved in the process at all, as it is the clerical and paraprofessional staff which typically interacts with the attorney service.

e.      In his declaration, HERMANSEN also claimed to have spent 1.8 hours on February 7, 2018 talking to an Escrow company and drafting a payoff demand.  It is simply incredible that this task would have required nearly 2 hours, and it is unlikely that this work was done by an attorney at all.

f.      Finally, in his declaration, HERMANSEN also claimed to have spent nearly an hour preparing a simple Memorandum of Costs form.  The caption is automatically generated by most legal forms programs used by legal secretaries.  And even the slowest typist would not require 0.8 hours – more than three-quarters of an hour – to type 3 letter x's, the dates 9/27/17, 10/30/17, and 02/07/18, and the dollar figures $25.00, $75.00, $2,170.00, and $2,270.00 (twice).  And since attorneys are required to enter their billing records contemporaneously, it should have been nothing more than hitting a few buttons to generate a report of the time purportedly spent.  Indeed, even if HERMANSEN waited until the date of the First Cost Memo to first prepare his fictional demand, it should not have taken more than a few minutes.

41.      MS. ZENDANO promptly filed a Motion to Tax Costs (the "Motion to Tax"), and on March 21, 2018, the Court granted in part MS. ZENDANO's Motion to Tax, therein reducing the amount to just one thousand and eighty-five dollars ($1,085.00).

42.      Apparently unsatisfied with the Court's ruling on the Motion to Tax, and after conferring with co-Defendants ALATORRE and the ALATORRE FIRM – both

-13-

COMPLAINT

in person and over the telephone wires, HERMANSEN drafted, filed, and sent through the mail, a Motion to Set Aside the Court's order taxing costs on or about April 26, 2018 (the "Motion to Set Aside"), with a hearing date scheduled for May 23, 2018.

43.     MS. ZENDANO opposed the Motion to Set Aside.  HERMANSEN then filed a reply brief in support of the Motion to Set Aside, placing the Reply Brief in the overnight mail of a Common Carrier, using BASTA's account therefor.

44.     At the hearing on May 23, 2018, the Court denied the Motion to Set Aside, leaving in place the previously ordered dramatic reduction of the claimed amounts from the First Cost Memo.

## THE DEFENDANTS SEND THEIR EXTORTIONARY PAYOFF DEMAND TO THE ESCROW AGENT UNDER THREAT OF DELAYING THE CLOSE OF ESCROW OR THWARTING THE SALE OF THE PREMISES ALTOGETHER

45.     After the nightmare of nearly two years of vindictive, mean-spirited, and mentally and physically draining legal proceedings related to the Premises, the emotional scarring from this whole process led MS. ZENDANO to decide that she would remain in New York State and not move her family into the Premises.

46.     MS. ZENDANO engaged a realtor to sell the Premises, and indeed did ultimately sell the Premises.  The close of escrow was delayed by the clouded title, but once the *lis pendens* was expunged by the Court and recorded with the County Recorder, MS. ZENDANO was finally able to begin the process of closing escrow on the pending sale of the Premises.

47.     The escrow agency was certainly aware of the involuntary lien recorded by the Defendants, and as part of the process of closing escrow and clearing all incumbrances upon the title, asked the Defendants for an updated payoff demand so

COMPLAINT

1   that it could be paid out of the proceeds from the sale in exchange for the recording of

2   a satisfaction of judgment to release the involuntary lien.

3      48.   On or about May 15, 2018, HERMANSEN transmitted through interstate

4   wires an e-mail to Ms. Tawnia Klaus of Rockpointe Escrow a payoff demand in the

5   amount of twenty-two thousand, seven hundred and eighty-two dollars and ninety-one

6   cents ($22,782.91) (the "Payoff Demand").  The Payoff Demand consisted of four

7   distinct line items:

8          a.   Fifteen thousand, eight hundred and twenty dollars ($15,820.00)

9      from the original August 22, 2017 reduced award on the underlying Fee

10     Motion;

11         b.   Two thousand, two hundred and seventy dollars ($2,270.00) from

12     the Defendants' Memorandum of Costs After Judgment filed on 02/07/18;

13         c.   Three thousand, five hundred and forty dollars ($3,540.00) for a

14     purported May 15, 2018 Memorandum of Costs After Judgment covering the

15     period between February 2, 2018 through May 15, 2018; and

16         d.   One thousand, one hundred and fifty-two dollars and ninety-one

17     cents ($1,152.91) in statutory interest on the August 22, 2017 fee award.

18     49.   Troublingly, while the $15,820.00 from the original award and the

19   $1,152.91 in statutory interest appeared to be facially accurate, neither the $2,270.00

20   amount claimed from the First Cost Memo nor the $3,540.00 claimed for a purported

21   May 15, 2018 Memorandum of Costs After Judgment were even close to being true or

22   correct.

23     50.   Indeed, at the time that the Defendants authored and then transmitted

24   *across interstate wires* their Payoff Demand, they were very much aware that they

25   were not in fact entitled to either the $2,270.00 or the $3,540.00 they demanded.

26     51.   At the time that that the Defendants authored and then transmitted *across

27   interstate wires* their Payoff Demand on or about May 15, 2018, the Defendants knew

28   that on March 21, 2018, the Court granted in part MS. ZENDANO's Motion to Tax,

-15-

therein reducing the amount to just $1,085.00.  It is beyond question that the Defendants were aware of this fact as they had filed their Motion to Set Aside on or about April 26, 2018.  They were also aware that the Court had set a May 23, 2018 hearing date for the Motion to Set Aside, so they were well aware that the Court had not yet taken any action to change its ruling on the Motion to Tax.

52.     Thus, on May 15, 2018 when the Defendants transmitted *across interstate wires* their Payoff Demand, the most that they would have been entitled to from the First Cost Memo was just $1,085.00.  Despite having unambiguous knowledge that you they not entitled to the $2,270 from the First Cost Memo that they demanded, they nonetheless made that demand *with the specific intent of delaying, impeding, or causing to fail the close of escrow*.

53.     Importantly, even if the Defendants believed that they would ultimately prevail upon their Motion to Set Aside, it still would not have been proper for them to actually demand the full amount of the First Cost Memo in the Payoff Demand.  Indeed, even if the Court were to later grant the Motion to Set Aside and determine that the Defendants were entitled to some or all of the additional monies stricken from the First Cost Memo, their sole remedy would have been to attempt to collect those additional monies through collection methods authorized under the Code of Civil Procedure.

54.     Under no circumstances were the Defendants entitled to anticipatorily demand the extra monies where the Court had already determined and ordered that they were not entitled to recover same.  Moreover, since the Court actually denied the Defendants' Motion to Set Aside on May 23, 2018, any belief that they may have had regarding their chances of success on their Motion to Set Aside were not reasonable and were clearly misplaced.

55.     At the time that the Defendants authored and then transmitted *across interstate wires* their Payoff Demand, they also demanded the sum of $3,540 for their

COMPLAINT

purported Memorandum of Costs After Judgment from February 7, 2018 through May 15, 2018 (the "Second Cost Memo").

56.     Troublingly, at the time that the Defendants authored and then transmitted *across interstate wires* their Payoff Demand, there was no Second Cost Memo.

57.     Indeed, despite their representations to the contrary in their fraudulent Payoff Demand transmitted *across interstate wires*, the Second Cost Memo was not actually filed until approximately May 24, 2018 according to the date on the form and the proof of service (also sent through the mail).

58.     Thus, on May 15, 2018, while the Defendants represented in their Payoff Demand transmitted *across interstate wires* that there was a memorandum of costs in the amount of three thousand, five hundred and forty dollars ($3,540.00), such a memorandum did not actually exist at that time.

59.     Thus, in their Payoff Demand transmitted *across interstate wires*, the Defendants willfully lied and misrepresented the amounts owed, knew that they were lying about how much they were entitled to receive, and intended for the escrow company and MS. ZENDANO to believe that the demanded amount was correct. Because of the Payoff Demand and knowing that failure to comply with the extortionary and false demand would delay or kill the sale of the Premises, MS. ZENDANO and the escrow company needed to rely upon the amount of the demand and pay the full amount to their detriment.

60.     Indeed, as with the fraudulent demand related to the First Cost Memo, the Defendant deliberately included the nonexistent Second Cost Memo as part of their Payoff Demand notwithstanding the fact that they were not entitled to demand, collect, or retain this amount, and in fact made this demand with the specific intent of delaying, impeding, or causing to fail the close of escrow should MS. ZENDANO fail to acquiesce and comply with their extortionary demand.

COMPLAINT

61.     Turning to the actual substance of the Second Cost Memo, even if it had been filed by the time the Defendants had transmitted *across interstate wires* their Payoff Demand, they would not have been entitled to ***any*** of the monies claimed therein.  Indeed, all of the monies claimed therein related to either the Motion to Tax where they were not the prevailing party, or their unsuccessful Motion to Set Aside wherein they were also not the prevailing party.

62.     Thus the Defendants had ***no entitlement whatsoever*** to demand, collect, or retain either the $3,540.00 they claimed in their May 15, 2018 Payoff Demand, nor were they entitled to demand, collect, or retain the slightly higher amount of three thousand, five hundred and sixty dollars ($3,560.00) alleged in the actual Second Cost Memo **that they** filed with the Court.

63.     As further evidence of the Defendants' illegal, fraudulent, and racketeering activity, in the First Cost Memo they claimed an entitlement to recover fees at an rate of three hundred and fifty dollars ($350) per hour (without any declaration as to the reasonableness of the rate) for HERMANSEN's time, yet in their Second Cost Memo just three (3) months later claimed an entitlement to recover fees at an rate of four hundred dollars ($400) per hour, a nearly fifteen percent (15%) increase, and again without any declaration as to the reasonableness of the dramatically increased rate.  Indeed, the wildly increased rate was part of the conspiracy to extort as much money as possible from MS. ZENDANO.

## DEFENDANTS WERE NOT ENTITLED TO THE FULL AMOUNT OF THE FACIALLY ACCURATE AMOUNTS DEMANDED

64.     While the amounts of $15,820.00 from the original award and the $1,152.91 in statutory interest demanded through the Payoff Demand appeared to be facially accurate (see ¶ 49, supra), as more fully detailed herein, MS. ZENDANO was actually entitled to a significant offset against these claimed amounts for monies owed to her by the Defendants.

65.     Indeed, the same broad attorney's fees provision in the underlying lease ("In the event that any action is filed in relation to this Lease, the unsuccessful Party in the action will pay to the successful Party, in addition to all the sums that either Party may be called on to pay, a reasonable sum for the successful Party's attorney fees.") which permitted the Defendants to make their claim for the costs and fees which were awarded on August 22, 2017 also allows MS. ZENDANO to recover her fees and costs as the successful party in both the Motion to Tax and in the Motion to Set Aside.

66.     MS. ZENDANO incurred and is entitled to recover attorney's fees in the amount of ten thousand, four hundred and twelve dollars and fifty cents ($10,412.50) and costs in the amount of four hundred and twelve dollars and sixty-nine cents ($412.69) for a total of ten thousand, eight hundred and twenty-five dollars and nineteen cents ($10,825.19) in relation to both her successful Motion to Tax and her successful opposition to the Defendants' Motion to Set Aside.

67.     MS. ZENDANO's attorney's fees indicated supra (see ¶ 66) arise out of twenty-four and one-half (24½) hours of attorney time, billed at four hundred and twenty-five dollars ($425) per hour for tasks which included but were not limited to (a) reviewing the First Cost Memo; (b) drafting the Motion to Tax; (c) appearing for the Court's hearing on the Motion to tax and traveling to and from same; (d) reviewing the Motion to Set Aside and researching the authorities cited therein; (e) drafting an Opposition to the Motion to Set Aside; (f) reviewing the Reply brief filed by the Defendants in support of their Motion to Set Aside; and (g) appearing for the Court's hearing on the Motion to Set Aside and traveling to and from same.

68.     MS. ZENDANO's claimed costs arise out of items which included but were not limited to (a) filing fees; (b) photocopying; (c) postage and messengers; (d) travel charges; and (e) litigation support vendors (i.e., attorney service) charges.

69.     At the time that the Payoff Demand was sent *across interstate wires* and through the United States Mail, the Defendants were entitled to collect no more than

COMPLAINT

eighteen thousand, fifty-seven dollars and ninety-one cents ($18,057.91) based upon the August 22, 2017 award in the amount of $15,820.00, the amount of $1,085.00 which was approved from the February 7, 2018 First Cost Memo, and the $1,152.91 in statutory interest.

70.    Notwithstanding the Defendants' entitlement to demand payment in an amount not exceeding $18,057.91, MS. ZENDANO in turn was entitled to demand and collect from the Defendants the sum of $10,825.19, thus leaving a difference of just seven thousand, two hundred and thirty-two dollars and seventy-two cents ($7,232.72) that should have been due and owing to the Defendants.

71.    Thus, despite Defendants' entitlement to recover a net sum of $7,232.72, and with full knowledge that they were not entitled to demand, collect, or retain the full sum of the Payoff Demand (indeed, on May 17, 2018, upon receiving the Payoff Demand, MS. ZENDANO's counsel sent a letter advising and reminding the Defendants that their Payoff Demand was improper) nonetheless still willfully held MS. ZENDANO's escrow hostage for the extortionary amount of $22,782.91.

72.    Since the Defendants did not withdraw or modify their Payoff Demand, MS. ZENDANO was then left with the "Sophie's Choice" of either paying the full Payoff Demand, including the fifteen thousand, five hundred and fifty dollars and nineteen cent ($15,550.19) difference between the $22,782.91 of the Payoff Demand and the $7,232.72 she actually owed (with the hope of being able to recover those amounts later) *or* losing the sale of the Premises and being liable for significant damages for her failure to perform on the sale contract.  MS. ZENDANO chose the former, and when the Defendants refused MS. ZENDANO's reimbursement demand, MS. ZENDANO was left with no choice but to seek relief from the Court in the instant action.

///

///

///

COMPLAINT

## COUNT ONE

**RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. § 1961 et seq.**
**[CIVIL RICO]**

73.     MS. ZENDANO realleges and incorporates by reference every allegation contained within this Complaint into this claim for relief as though each were fully set forth and stated within this paragraph.

74.     The individual enterprise defendants acted as an enterprise within the meaning of 18 U.S.C. § 1961(4) which defines an enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

75.     The individual RICO Defendants are separate and distinct from the association in fact enterprise that they formed.  Their roles originate from different positions, employers, and areas of expertise.

76.     The entity RICO defendants have an ascertainable structure separate and apart from the pattern of racketeering activity of their separate and distinct enterprise named herein.

77.     The individual RICO Defendants named herein that are employed by these various entity RICO defendants forged an alliance and created an enterprise which engaged in racketeering activity as set forth herein.

78.     The RICO Defendants, and each of them, formed an association in fact enterprise which executed a plan of extorting monies from and demanding payment of an unlawful debt from MS. ZENDANO through a pattern of racketeering activity.

79.     Through their enterprise, the RICO Defendants, and each of them, benefitted from their enterprise through collecting and retaining for their own use the ill-gotten monies that they extorted from MS. ZENDANO.

80.     The enterprise activities set forth herein involved interstate or foreign commerce through the use of interstate wires and U.S. Mail that are channels of interstate commerce.  Moreover, the association in fact enterprise set forth herein

affected the sale of properties located in at least two states, i.e., New York and California, and thus amounted to conduct which qualifies as interstate commerce.

81.     The object of the conspiracy as alleged herein is very straightforward. The RICO Defendants are largely eviction defense attorneys who are well aware of the very limited resources of litigants engaged in unlawful detainer proceedings.  They are well aware that these individuals, like the victim MS. ZENDANO herein, generally lack the financial and other resources to engage in a protracted legal battle to challenge the unlawful financial demands that they make.  By way of illustrative example, in their First Cost Memo, the Defendants demanded and sought two thousand, two hundred and seventy dollars ($2,270.00) in post judgment costs when they were only entitled to demand, collect, and retain just one thousand and eighty-five dollars ($1,085.00) – a difference of one thousand, one hundred and eighty-five dollars ($1,185.00).  It will cost, and indeed did cost several times more than $1,185 to successfully challenge the excess demand through proper legal process.  The Defendants know full well that most persons will not spend more than a debt is worth to collect upon it, and they exploit this fact to their benefit.

82.     As described hereinabove, the Defendants engaged in several acts of Mail Fraud when they deposited their extortionary demands in the United States Mail or common carrier.  18 U.S.C. § 1341 defines Mail Fraud by stating in pertinent part that

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be

-22-

> deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

Indeed, at a minimum, on or about February 7, 2018, Defendants placed their First Cost Memo with the United States Postal Service for delivery; on or about May 15, 2018 the Defendants placed their Payoff Demand with the United States Postal Service for delivery; and on or about May 24, 2018, the Defendants placed their Second Cost Memo with the United States Postal Service for delivery.

83.   As described hereinabove, the Defendants engaged in several acts of Wire Fraud when they transmitted or caused to be transmitted their extortionary demands through electronic mail and when they made telephone calls to further their scheme.  18 U.S.C. § 1343 defines Wire Fraud by stating in pertinent part that

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

Indeed, at a minimum, on or about February 7, 2018, the Defendants e-mailed or caused to be e-mailed their First Cost Memo; on or about May 15, 2018 the Defendants e-mailed or caused to be e-mailed their Payoff Demand; and on or about May 24, 2018, the Defendants e-mailed or caused to be e-mailed their Second Cost Memo.   Furthermore on or about February 7, 2018 and again on or about May 15, 2018, Defendants made telephone calls to numerous third parties, including MS.

ZENDANO's escrow officer, for the purpose of furthering their illegal scheme and racketeering enterprise.

## COUNT TWO

### ECONOMIC DURESS AND CIVIL EXTORTION

### (Brought Against All Defendants)

84.    MS. ZENDANO realleges and incorporates by reference every allegation contained within this Complaint into this claim for relief as though each were fully set forth and stated within this paragraph.

85.    Economic duress exists when one party has done a wrongful act which is sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract.

86.    Defendants have wrongfully coerced MS. ZENDANO to make a Sophie's Choice between two very bad alternatives, to wit, either pay more than fifteen thousand dollars in excess of that which she actually owes to the Defendants or risk losing the sale of the Premises – a sale which was necessary so that MS. ZENDANO could put a roof over her family's head back in New York State. Defendants have further coerced MS. ZENDANO to surrender or otherwise forego certain rights, as detailed throughout this Complaint, also under the threat of harsh (but unwarranted and undeserved) legal consequences.

87.    MS. ZENDANO had no reasonable alternative but to acquiesce to each of the Defendants' wrongful, unlawful, and coercive demands, as there were no reasonable alternatives available to her. It is patently unreasonable to pay an extortionary demand of more than fifteen thousand dollars.

88.    It is also patently unreasonable to breach a sale contract by failing to deliver clear title, thus subjecting yourself to significant damages, and it is even more unreasonable to breach the sale contract when the proceeds are absolutely necessary to

provide shelter for one's family.  Indeed, no reasonable person would allow her family to be homeless if there were an alternative that provided the necessary shelter.

89.   Furthermore, if MS. ZENDANO failed to comply with the Defendants' extortionary demand, she would have been in material breach of her contract to purchase the New York home for which she was already in escrow.

90.   MS. ZENDANO has suffered significant economic and non-economic damages as a proximate result of Defendants' actions, in an amount to be proven at trial, but within the jurisdictional limits of this Court.

91.   Defendants have, individually and in concert, acted with recklessness and conscious disregard of MS. ZENDANO's rights. Defendants' acts and omissions have been grossly negligent, malicious, oppressive and fraudulent, thereby entitling MS. ZENDANO to punitive damages in an amount to be determined at trial.

## COUNT THREE
### FRAUD
### (Brought Against All Defendants)

92.   MS. ZENDANO realleges and incorporates by reference every allegation contained within this Complaint into this claim for relief as though each were fully set forth and stated within this paragraph.

93.   On or about May 15, 2018, Defendants, and each of them represented to MS. ZENDANO and her escrow officer that MS. ZENDANO owed them and/or their clients the sum of twenty-two thousand, seven hundred and eighty-two dollars and ninety-one cents ($22,782.91).

94.   At the time that the Defendants made this representation, it was utterly and completely false.

95.   Notwithstanding the fact that the Defendants knew that this representation was false at the time they made the representation, the Defendants made this representation recklessly and without regard for the truth, and with the

intention that MS. ZENDANO would rely on the representation and therefor authorize the payment of the demanded monies through the escrow settlement for the sale of the Premises.

96.     MS. ZENDANO indeed relied upon the Defendants' representation and was indeed harmed in that she paid monies that she was not otherwise required to pay, and incurred other fees and costs, all to her detriment.  MS. ZENDANO's reliance upon the Defendants' willful misrepresentation was a substantial factor, indeed the most substantial factor, in causing her harm and damages.

97.     On or about May 15, 2018, Defendants, and each of them also represented to MS. ZENDANO and her escrow officer that MS. ZENDANO owed them and/or their clients the sum of two thousand, two hundred and seventy dollars ($2,270.00) based upon a Memorandum of Costs After Judgment filed on or about February 7, 2018.

98.     At the time that the Defendants made this representation, it was also false in that the Court had long ago stricken the majority of this amount as a result of MS. ZENDANO's successful Motion to Tax (and the Defendants were most certainly aware of this fact in that they had already filed a Motion to Set Aside – a motion which was ultimately denied by the same Court).

99.     Notwithstanding the fact that the Defendants knew that this representation was false at the time they made the representation, the Defendants made this representation recklessly and without regard for the truth, and with the intention that MS. ZENDANO would rely on the representation and therefor authorize the payment of the demanded monies through the escrow settlement for the sale of the Premises.

100.   MS. ZENDANO indeed relied upon the Defendants' false representation and was indeed harmed in that she paid monies that she was not otherwise required to pay, and incurred other fees and costs, all to her detriment.  MS. ZENDANO's

COMPLAINT

reliance upon the Defendants' willful misrepresentation was a substantial factor, indeed the most substantial factor, in causing her harm and damages.

101.   On or about May 15, 2018, Defendants, and each of them further still represented to MS. ZENDANO and her escrow officer that MS. ZENDANO owed them and/or their clients the sum of three thousand, five hundred and forty dollars ($3,540.00) based upon a Memorandum of Costs After Judgment purportedly filed on May 15, 2018.

102.   At the time that the Defendants made this representation, it too was false.

103.   Notwithstanding the fact that the Defendants knew that this representation was false at the time they made the representation, the Defendants made this representation recklessly and without regard for the truth, and with the intention that MS. ZENDANO would rely on the representation and therefor authorize the payment of the demanded monies through the escrow settlement for the sale of the Premises.

104.   MS. ZENDANO indeed relied upon the Defendants' representation and was indeed harmed in that she paid monies that she was not otherwise required to pay, and incurred other fees and costs, all to her detriment.  MS. ZENDANO's reliance upon the Defendants' willful misrepresentation was a substantial factor, indeed the most substantial factor, in causing her harm and damages.

## **COUNT FOUR**
### **CONVERSION**
### **(Brought Against All Defendants)**

105.   MS. ZENDANO realleges and incorporates by reference every allegation contained within this Complaint into this claim for relief as though each were fully set forth and stated within this paragraph.

106.   At all times alleged herein, MS. ZENDANO was the owner of (a) the Premises; and (b) certain monies, including but not limited to the fifteen thousand,

five hundred and fifty dollars and nineteen cents ($15,550.19) in excess of what MS. ZENDANO actually owed which was demanded by the Defendants through the Payoff Demand; and other property.  Alternatively, to the extent that MS. ZENDANO was not yet the owner thereof, she had the right to possession of the money or property that was unlawfully converted by Defendants.

107.   At all times alleged herein, Defendants, and each of them, wrongly took MS. ZENDANO's money or property, without good cause, permission, or authorization, for their own personal and wrongful use.  Defendants, and each of them, were direct beneficiaries of the conversion as they obtained financial benefits including, but not limited to, the payment of their own personal and business debts and liabilities.

108.   As a proximate and legal result of the conversion by Defendants, MS. ZENDANO suffered damages, including but not limited to, the amount of money converted, as well as the time and money expended to recover said wrongfully converted funds, including, but not limited to, her attorneys' fees and costs.

109.   Defendants have, individually and in concert, acted with recklessness and conscious disregard to MS. ZENDANO's rights. Defendants' acts and omissions have been grossly negligent, malicious, oppressive and fraudulent, thereby entitling MS. ZENDANO to punitive damages in an amount to be determined at trial.

## COUNT FIVE

**VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200 et seq.,**
**UNLAWFUL, FRAUDULENT, AND UNFAIR**
**BUSINESS ACTS AND PRACTICES**
**(Brought Against All Defendants)**

110.   MS. ZENDANO realleges and incorporates by reference every allegation contained within this Complaint into this claim for relief as though each were fully set forth and stated within this paragraph.

-28-

COMPLAINT

111.   MS. ZENDANO realleges and incorporates by reference all allegations contained in this Complaint as though fully set forth herein.

112.   This claim for relief and cause of action arises out of California's statutory and common law.

113.   The acts and conduct of the Defendants, and each of them, as alleged throughout this Complaint, and in each claim for relief and cause of action above, constitute unlawful and unfair business acts and practices, and thereby violate Section 17200 et seq. of the California Business & Professions Code.

114.   As a proximate result of the Defendants' unlawful and unfair business acts and practices, MS. ZENDANO has incurred substantial economic and financial damages, as detailed more fully throughout this Complaint, and in amount to be proven at trial.

115.   Accordingly, MS. ZENDANO is entitled to equitable relief, including restitution, and any other appropriate relief authorized by Section 17200 et seq. of the California Business & Professions Code.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff IRENE ZENDANO prays for judgment and relief against Defendants BASTA, INC., a California nonprofit corporation; THE LAW OFFICE OF DANIEL J. BRAMZON & ASSOCIATES, P.C., a California corporation; ALATORRE & ASSOCIATES PROFESSIONAL LAW CORPORATION, a California corporation; ANDRES X. ALATORRE, an individual; KEVIN P. HERMANSEN, an individual; DANIEL J. BRAMZON, an individual; and DOES 1-10, inclusive, as follows:

a.   For the RICO violations, MS. ZENDANO prays for an award of trebled damages as consistent with 18 U.S.C. § 1964(c), compensatory and actual damages, reasonable attorneys' fees, pre-judgment interest, post- judgment interest, costs, and an award that this Court deems just and proper;

COMPLAINT

1

b.      For the other claims for relief and causes of action, MS. ZENDANO

2  prays for in excess of two hundred and fifty thousand dollars ($250,000) in

3  compensatory damages and in excess of two million dollars ($2,000,000) in punitive

4  damages, not including the trebled damages for the RICO causes of action, against the

5  Defendants, each and every one of them jointly and severally;

6

c.      MS. ZENDANO further prays for an award of Attorney's fees and other

7  litigation costs reasonably incurred in this action pursuant to the Racketeer Influenced

8  and Corrupt Organizations Act and the other causes of action herein.

9

d.      MS. ZENDANO prays further still that judgment be entered against the

10  Defendants, and each of them, for any and all damages pursuant to *inter alia* Cal. Bus.

11  & Prof. Code § 17200 et. seq. and the common law, specifically including but not

12  limited to: (i) compensatory and consequential damages sustained by MS.

13  ZENDANO; (ii) disgorgement of any revenues and/or profits earned as a result of the

14  unlawful acts of the Defendants as set forth herein; (iii) treble damages to the extent

15  permitted by law; (iv) all costs of this action and prejudgment interest at California's

16  statutory rate pursuant to *inter alia* Cal. Civ. Code § 3288  based upon the

17  Defendants' fraud, malice, and oppression; and (v) reasonable attorneys' fees pursuant

18  to *inter alia* California's Private Attorney General Act ("PAGA") to the fullest extent

19  applicable;

20

e.      Finally, MS. ZENDANO prays that this honorable Court grant her any

21  and all other remedies and relief that the Court believes to be equitable, just, or proper.

22

23  Dated:  June 11, 2018               **LAW OFFICE OF NEAL S. ZASLAVSKY**

24                                      **A PROFESSIONAL CORPORATION**

25                                      By:    */s/ Neal S. Zaslavsky, Esq.*

26                                             Neal S. Zaslavsky, Esq.
                                               *Attorneys for IRENE ZENDANO*
27

28

COMPLAINT